# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS

```
* * * * * * * * * * * * * * * * * * * * * * * * *
PRENTISSA RODRIGUE,             *
                                *   No. 17-1364V
              Petitioner,       *   Special Master Christian J. Moran
                                *
v.                              *
                                *   Filed: October 22, 2019
SECRETARY OF HEALTH             *
AND HUMAN SERVICES,             *
                                *   Tentative Finding of Facts
              Respondent.       *
* * * * * * * * * * * * * * * * * * * * * * * * *
```

<u>Frank Lamothe</u>, Lamothe Law Firm, L.L.C., New Orleans, LA, for petitioner;
<u>Lynn Schlie</u>, United States Dep't of Justice, Washington, DC, for respondent.

### **UNPUBLISHED TENTATIVE RULING FINDING FACTS**[1]

Special masters may provide tentative findings and conclusions during the pendency of litigation.  <u>See</u> Vaccine Rule 5.  In the undersigned's estimation, the rules envision that tentative findings before all the evidence is developed could facilitate formal and informal resolution of a claim.  The undersigned offers the following tentative findings and conclusions so that the parties may be able to focus their efforts on those issues that are material and remain disputed.  These findings are tentative insomuch as they are subject to change upon the presentation of additional evidence or argument.

The parties dispute when Ms. Rodrigue began to experience significant neurologic problems after her November 1, 2016 flu vaccination.  A hearing was held on October 16-17, 2019, in New Orleans, Louisiana.  <u>See</u> Campbell v. Sec'y of Health & Human Servs., 69 Fed. Cl. 775, 779-80 (2006) (noting the efficacy of holding a hearing in cases where testimony and medical records conflict).  Due to the effects of medication, Ms. Rodrigue did not testify.  However, Ms. Rodrigue called her husband, two daughters, and a neurologist who treated her (Dr. Trahant).  The Secretary called Ms. Rodrigue's primary care physician, Dr. Acosta.  The undersigned has considered all the evidence including the testimony from that hearing.

---

[1] The E-Government Act, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services), requires that the Court post this decision on its website (https://www.uscfc.uscourts.gov/aggregator/sources/7).  This posting will make the decision accessible to anyone via the internet.  Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4).  Any redactions ordered by the special master will appear in the document posted on the website.

Pursuant to well-established standards for determining when events did or did not happen, see Sanchez v. Sec'y of Health & Human Servs., No. 11-685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013), mot. for rev. denied, 142 Fed. Cl. 247, 251-52 (2019), appeal docketed, No. 2019-1753 (Fed. Cir. Apr. 9, 2019), the undersigned finds how the evidence preponderates. In setting forth the findings, the undersigned also cites to the primary evidence that is the basis for the finding. The undersigned recognizes that not all evidence is entirely consistent with these findings. See Doe 11 v. Sec'y of Health & Human Servs., 601 F.3d 1349, 1355 (Fed. Cir. 2010) (ruling that the special master's fact-finding was not arbitrary despite some contrary evidence). Indeed, it is the presence of inconsistent evidence that dictated a proceeding to resolve factual disputes.

After considering the witnesses' testimony as well as the documentary evidence, the undersigned finds that **Ms. Rodrigue first experienced a dramatic decline in her neurologic function on approximately January 30, 2017**. The primary reasons supporting this finding are as follows:

1. Before receiving the flu vaccination on November 1, 2016, Ms. Rodrigue was generally active. She suffered from chronic cervical pain and lumbar pain following motor vehicle accidents. See exhibit 5 at 101 (Dr. Trahant letter to insurance company), exhibit 16 at 4. These pre-existing problems complicate Ms. Rodrigue's case in that the neurologic problems that she eventually experienced were not fresh. She had grown accustomed to dealing with pain.

2. With her husband Ms. Rodrigue visited Dr. Acosta on January 11, 2017. Exhibit 7 at 4-6.[2] Dr. Acosta's notes do not memorialize any complaints about (a) an inability to walk down the stairs in her house, (b) an inability to walk from her bed to the bathroom to use the toilet, (c) an inability to participate in holiday functions such as cooking, and (d) an inability to use normal utensils for feeding. Dr. Acosta testified that if Ms. Rodrigue or her husband told him any of these problems, he would have documented them. Dr. Acosta appeared to be a conscientious doctor, who wanted to keep medical records that were as accurate as possible within the frustrating limitations of the electronic medical records system. Dr. Acosta's testimony—that if he had been told about significant problems, he would have documented them—is credited.

3. Dr. Acosta's notes indicate that Ms. Rodrigue or her husband told him she was having "chronic pain." This report is consistent with her long-standing cervical and lumbar issues. Ms. Rodrigue's ongoing chronic pain also can explain why Mr. Rodrigue

---

[2] Dr. Acosta was Ms. Rodrigue's doctor for her diabetes. See exhibit 7 at 26 (April 5, 2016 appointment). She missed her regularly scheduled appointment on October 25, 2016. Exhibit 7 at 13-14. Consistent with this history, Dr. Acosta stated that the critical January 11, 2017 appointment appeared to be for routine care. However, Mr. Rodrigue testified that the appointment was scheduled to address Ms. Rodrigue's acute needs. The only acute need noted by Dr. Acosta was recurrent nose bleeds. Exhibit 7 at 4. Determining the purpose of this appointment is not necessary to determine when Ms. Rodrigue's more significant neurologic pain began.

purchased a neck and shoulder wrap at Walgreens a few days after Thanksgiving (exhibit 24) and why Ms. Rodrigue wore a homemade sling at Christmas (exhibit 25).

4. On January 18, 2017, and January 23, 2017, Ms. Rodrigue saw Nurse Practitioner Saavedra for, predominantly, cough and congestion. Exhibit 15. Ms. Saavedra diagnosed Ms. Rodrigue as suffering from sinusitis and bronchitis. Id. at 10.[3] Neither Ms. Rodrigue nor her daughter who accompanied her to this appointment communicated that Ms. Rodrigue was having such significant problems walking that Ms. Rodrigue required assistance from the fire department to leave her house.

    a. The lack of a complaint from Ms. Rodrigue or her daughter at both appointments is significant because if Ms. Rodrigue were experiencing significant problems in conducting usual activities like walking, bathing, or toileting, then someone would have communicated these problems during these encounters with a medical professional.

    b. Notations in the records from Ms. Saavedra that Ms. Rodrigue denies neurologic problems such as gait abnormality (exhibit 15 at 4, 8) carry less weight. As Dr. Acosta explained with respect to his medical records, determining which parts of an electronic medical record reflect information communicated to and recorded by a medical professional is difficult. For Ms. Saavedra's medical record, the evidence is not clear whether comments such as "denies gait abnormality" reflects a default entry in an electronic medical record. However, to the extent that the electronic medical records from Ms. Saavedra's office can be given any weight, the notation is consistent with an onset after January 23, 2017.

5. Ms. Rodrigue saw Dr. Trahant on March 8, 2017. Dr. Trahant recorded the following history: "[1] In mid-January, she had pneumonia and the flu, and [2] one week later she received a pneumonia vaccine and a flu vaccine. [3] One week later after receiving the vaccines, she developed generalized weakness, first in her legs, and then in her upper extremities. [4] She also started with severe burning in her hands and her feet." Exhibit 16 at 4. The history recorded by Dr. Trahant is not entirely accurate.

    a. For sentence [1], it appears that Ms. Rodrigue was not diagnosed as suffering from pneumonia and the flu. See footnote 3 above. The undersigned recognizes that people who are not medical professionals might use "pneumonia" or "the flu" to describe a respiratory ailment when a medical professional might use a different term, such as "sinusitis" or "bronchitis." It is accurate to say that in mid-January, Ms. Rodrigue suffered from sinusitis and bronchitis.

    b. For sentence [2], Ms. Rodrigue did not receive the pneumonia vaccine and the flu vaccine at the same time. Ms. Rodrigue received the flu vaccine on November 1, 2016. Exhibit 3. She also received a dose of the Prevnar vaccine at Dr. Acosta's

---

[3] Although Mr. Rodrigue and other witnesses stated that Ms. Saavedra diagnosed Ms. Rodrigue as also suffering from the flu and pneumonia, the documentary basis for this testimony is not readily apparent within exhibit 15.

3

       office on January 11, 2017.  Exhibit 7 at 4-6.  Regardless, the Prevnar vaccination was one week before (not week after) Ms. Rodrigue developed respiratory problems.

    c. For sentence [3], the statement "one week after receiving the vaccines" cannot be accurate in that Ms. Rodrigue did not receive two vaccines (plural) at the same time.  As explained above, it is also not likely that Ms. Rodrigue developed generalized weakness "one week" after the Prevnar vaccine because if she had, Ms. Rodrigue would have communicated this problem to Ms. Saavedra.  Instead, the more likely explanation is that Ms. Rodrigue developed generalized weakness approximately one week after having respiratory problems.

    d. For sentence [4], this sentence is accurate.  In addition to having generalized weakness, Ms. Rodrigue also experienced a burning feeling in her hands and feet.

6. Mr. Rodrigue adequately explained the delay in treatment from the end of January to beginning of March.  Although Ms. Rodrigue first started to experience a significant deterioration in her neurologic functioning on January 30, 2017, she saw Dr. Trahant on March 8, 2017.  This delay in treatment is approximately 5.5 weeks.

    a. Ms. Rodrigue and her husband may have been slow to realize that the generalized weakness differed from previous cervical and lumbar issues as well as any weakness caused by her sinusitis and bronchitis.

    b. Scheduling an appointment with Dr. Trahant may have taken some time, in part, because Dr. Trahant may have been out of his office during a portion of the Mardi Gras season in February 2017.

7. Dr. Trahant's August 15, 2018 letter (exhibit 27) carries little evidentiary weight.  Dr. Trahant did not record information in context of providing medical services.  The letter is directed toward litigation.  While Dr. Trahant accepted the accuracy of information contained in affidavits, this task is ultimately for the special master as finder of fact.  See Burns v. Sec'y of Health & Human Servs., 3 F.3d 415 (Fed. Cir. 1993).  Furthermore, before preparing his August 15, 2018 letter, Dr. Trahant did not consider other sources of information such as Dr. Acosta's January 11, 2017 report or the notes from Ms. Saavedra's January 2017 appointments.

A status conference to discuss these tentative findings of fact is scheduled for **Monday, November 4, 2019, at 2:00 P.M. Eastern Time**.  If the parties retain any witnesses to opine about causation, the parties must present this Tentative Ruling to any potential experts.  See Burns, 3 F.3d 415.

Any questions may be directed to my law clerk, Andrew Schick, at (202) 357-6360.

**IT IS SO ORDERED.**

                                      s/Christian J. Moran
                                      Christian J. Moran
                                      Special Master